Good morning. This morning we have oral argument in the case of the City of Mukilteo v. U.S. Department of Transportation. Counsel for the petitioners, you may proceed. You may proceed. You may proceed, Counsel. At risk of repeating myself, I'm Barbara Richman, Counsel for Petitioners, City of Mukilteo, City of Edmonds, Save Our Communities, Michael Moore, and Victor Kupes. I'm going to start by cutting to the chase. First issue out of the box, this is not a factual challenge. We do not contest the forecasts made by the Federal Aviation Administration, the respondents. We accept them in whole cloth, including their maximum terminal capacity scenario and their master plan, all of its scenarios. Counsel, if you would indulge us, I think we are concerned about a threshold issue, and that has to do with whether we have jurisdiction under any number of rubrics, mootness perhaps, but there's also the Lujan standing problem. And I guess what we need you to tell us is whether this is action that is certainly impending. Your Honor, we don't, with all due respect, we don't believe there is a standing problem of any kind whatsoever, and I'll explain. First, I don't want to belabor the point, but as you know, there has to be a concrete and particularized injury, which you've emphasized has to be actual and imminent and fairly attributable to the action being challenged and redressable by this Court. That being said, Clapper, which was cited to us in your order, has to do with the challenge to constitutionality of a statute. NEPA and a challenge under NEPA is extremely different when it comes to standing. Ironically, this Court But this is a very unusual situation, it seems to me, in that the whole agency proceeding took place, and not just now, but even when it took place, before it was at all clear that anything was actually going to happen. It was kind of a clearance for something to happen should they decide to have it happen, but because the agency is somewhat peripherally involved in this whole situation, they're not in control of whether it happens. So we don't know that anything's ever going to happen. It's different from a typical NEPA situation where you have so-called procedural standing, and it's certainly a lot looser, but it's not, I haven't seen a situation before if we didn't, where it might not be clear what the injury is, but it was clear that something was going to happen. Well, there's something going to happen here, too, Your Honor, and that is, one, the building of a terminal that can accommodate We know that. That's not what the record shows. The record shows that FAA offered $200,000 to the county to commence the planning study for the building of the terminal, and the county refused the $200,000. So at this point, there are no plans to commence construction of the terminal. But, Your Honor, it's approved by the FAA, and once it's approved No action on building it is imminent, nor have either of the two applicants, Allegiant or Horizon, sought to amend their Part 119 certificates in order to permit them to operate their particular-sized aircraft out of Payne Field, nor has the county sought to amend its Part 139 certificate to change the authorization for the operation of the airport. So the four key points of the agency's decision have not come to fruition. So how can we say that action is imminent on this record? Because, Your Honor, whenever the FAA approves a record of decision, the action is not going to take place the next day. Once it's approved, it could take place tomorrow. No agency action at any airport is guaranteed to take place when a ROT is signed. But that seems to me to be the interesting part of this, which is that the statute does require that you challenge the decision within, what, 60 days? Yes, that's exactly correct. So there's some tension between that provision and the usual standing rule as to whether something has to be actually going to happen. So what do we do with that? The reason that is taking place, the reason that exists, that tension, as you have put it, is because when the FAA issues a Part 139 certificate to an airport, opening it to commercial traffic, any commercial traffic can come there at any time. Now, I would point out to you, Your Honors, your own case, California XREL, Imperial County Air Pollution Control District, said that there is this lapse of time between the agency action and the action actually taking place, but that does not impact standing. And that case was decided on May 27, 2014. But how is this any different from what the Supreme Court said in Lujan, that you have to show something more than someday these actions will occur? And none of them have occurred. And based on the supplementation of the record, Allegiance said it no longer has any interest, and apparently Alaska and Horizon are saying, we're not coming to Payne Field unless one of our competitors makes an application to come. So they're not coming, the county's not building the terminal, and the certificate hasn't been amended. To me, this is Lujan. It's someday, and that's not imminent certain injury that is likely to occur. Well, another panel of this Court found in your California XREL, Imperial County, Did you send a 28-J letter in that case? Pardon me? Did you send a 28-J letter in that case? On that case, we weren't requested to do a letter brief. Well, our rules require that if you're citing a case that was not in your briefs, you must provide opposing counsel with notice in what we call a 28-J letter. Okay, we did not. You have not done that? We did not. It was just decided. If you wish us to look at that authority, please take care of that. We will, Your Honor, immediately. Let me ask you a slightly related question. How would you be prejudiced at this point if we simply dismissed the action and asked the parties to take a wait-and-see approach to see whether the FAA actually ever implements any of these decisions? Because our statute of limitations has expired. And once that expires, we cannot challenge the actual approval. But that would mean that it would have to be exactly the same players and the same four key points. I'll give you the change in the Part 139 certificate, but you have no evidence that they're building a passenger terminal or have any plans to do so. And one of the applicants has withdrawn, and the other says they're not interested unless a competitor comes in. So doesn't that mean that the whole process will have to start over again when some new competitor shows up and says, we'd now like to start operating commercial passenger service out of Payne Field? No, Your Honor, because Horizon and Allegiant have not officially withdrawn. And, in fact, the subsequent newspaper articles say that they are still and we submitted this in a supplemental request for judicial notice, that they are still interested and they're still proceeding according to their plans. That's not what they said. They're adopting a wait-and-see approach. Allegiant says, we're not interested, so they're out. And Alaska says, we're not going to do anything unless a competitor does something. So how is that certain or imminent action? That actually was not what was said in the newspaper articles very recently that we submitted to you in support of one of our supplemental documents. Let me ask the question a different way. If two of the legs of the four-part decision are not going to go forward, the construction of the terminal, which has to happen before anybody can fly commercial passengers in and out of Payne Field, and Allegiant is no longer interested, doesn't that by definition mean that the whole process is going to have to start over again with a new entrant? Not at all, Your Honor. Well, wouldn't a new entrant's Part 119 certificate have to be amended? Wouldn't a passenger terminal have to be constructed? For the new entrant, yes, but for the passenger terminal, no. Because once this rod is signed, the FAA's approval is on record. They can go forward at any moment of any day. And I would point something out to you. I hate to cite this case again because I haven't submitted the 28-H yet, but I will immediately. And that case is very clear that where such a situation as this exists, this tension, this is the absolute example of redressability. Because if you dismiss this case, then we have lost our ability to challenge the terminal. I have an assumption. I mean, the question is whether there isn't some more sensible way to handle this, such as a stay or an assurance that if it comes back that we will invoke the good cause provision or something to that effect. I mean, it doesn't ñ on the one hand, you have a problem, you're right, because of the statute. On the other hand, we have a problem because we have a jurisdictional, a constitutional jurisdictional problem. And to be deciding something which is pretty airy at this point is a problem for us in the court. So the question is whether there isn't some practical solution here. Apparently there is. We have discussed ñ Mr. McFadden and I have discussed a potential solution whereby ñ and he can explain it in more detail because it was his solution. But it is basically to ask this court to stay the case pending the action that it desires to see, as long as we don't lose a statute of limitations on the statute of limitations. How long would it impose the stay for? Because it sounds like, on the state of the record, it would be an indefinite stay at this point. Well, we could renew it. We could set a specific time and then renew the stay after, say, six months or whatever. My fear, Your Honor, is if this case were dismissed without the solution, the positive solution that we're talking about, then tomorrow morning after this dismissal, every airline in America could come in there, including Horizon and Allegiant. I gather that is ñ I mean, you do have a problem. You're slightly overstating it because my understanding is from at least the government's briefing that no airline can come in unless the government approves it first. Except Horizon and Allegiant, which have already been approved. And they can do so, by the way, with an indefinite number of flights with the same number of aircraft without additional environmental review, according to the government. What do we do with the declaration of Timothy Hayward? There's another one as well, but this one says, as of today, May 21st, no official request for an amendment to Horizon Airlines' operation specification has been received by the FAA. Nothing has happened. Nothing has matured. Well, the ROD was signed, Your Honor. That's as much maturation as we can go with without ñ But it was a very peculiar ñ I mean, I guess they were in an unusual hurry, the FAA, because they approved something that hadn't even been applied for. Is that right? No, because at the time it was applied for, they dropped out after it was approved. Horizon and Allegiant dropped out. They actually applied or they said they were going to apply? No, they did apply. And they were approved. The whole four aspects of the project were approved. Subsequent to that time, there was some dispute between the airport and Horizon and Allegiant, or passengers dropped off or whatever. And Horizon and Allegiant amended their plans, although Horizon says that it's still ñ or rather, Allegiant says that it's still operating according to its original plan. Your preference would be for this court to go forward, reach the merits, and determine whether or not the FAA acted in an arbitrary and capricious manner when it determined a finding of no significant impact, even though you began your argument with the concession that you have no quarrel with the methodology that the agency applied in reaching that decision. Do you really want us to go there? Wouldn't you rather have the state of affairs sort of maintain status quo with the ability to come back in and challenge some future action if it occurs, as opposed to getting a ruling from this court on the merits that you might not like? Well, that's always a risk. I haven't talked to my colleagues yet, so I'm not sure what their views are. But I have to tell you, frankly, as far as this judge is concerned, you've got an uphill fight on the challenge to the merits of the FAA decision. Well, if I could clarify and then ñ Well, maybe this is a good time to go to the merits. That's where you started your argument today. Perhaps we can go to that now. If Your Honor wishes, I will certainly be happy to do so. And I wanted to clarify perhaps a misconception by Judge Tallman, and that is to say, yes, we don't challenge the forecasts. What we do challenge is the absence of the analysis of air quality arising from those forecasts. Well, we know, do we not, from the current numbers, that those forecasts were wildly overstated. No, we don't, Your Honor. The original ones. The original ones. The master plan. The master plan. You mentioned the master plan, which had anticipated far more flight operations than have actually turned out to be true, going clear back to when they were forecasting in 2000, 2002. But master plans are 20-year forecasts, and master plans often ñ But they were totally incorrect for the period that already happened, which is most of it, right? That's because of the economy. Every airport's master plan went off. So, I mean, I gather ñ I mean, to get to the legal issues, that you're essentially saying that the FAA, in making a specific decision many years later, had to rely on the forecasts in the master plan. Is that what you're saying? No, not at all. The FAA relied on the final environmental assessment and its appendices, Appendix Q, Appendix P, Appendix K, the Hirsch report, and the appendix which ñ So, you're backing out ñ because in your briefing, you do spend a lot of time relying on the master plan forecasts. But they say in their EA that they were just ñ they're basically walking away from those forecasts because they proved to be inaccurate. Actually, we spent, I believe, far more time on the EA. We should forget about the master plan now. Yeah, yeah, let's forget about it. Yes. So, we're forgetting the master plan. So, what are we ñ We're relying on Appendix Q and Appendix P of the FAA. Appendix P, I mean, which seems to be your strongest point, they say, well, look, we're doing this so you can see, you know, what the actual operations would be if the projected terminal were actually used to its fullest, but we see no likelihood that it's going to be, and so that's why we haven't done anything with it. Moreover, we don't even know now if there's going to be a terminal. Well, and that's the point that you raised earlier on standing, and I will go back to that. More specifically, if there ñ because of that, we don't ñ if there's a terminal, we have no idea what it's going to look like. But if ñ let me point out that the NEPA regulations, 40 CFR 1502.22B4, requires that any analysis include the impact of catastrophic events, which may have a low probability. Well, this is not catastrophic. This is not catastrophic. There are no catastrophic events. What's catastrophic here? A plane crash? Is that what you said? No. The envelope established by the NEPA regulations includes exactly the kind of situation such as this, where there's a maximum terminal capacity already calculated, which could occur according to their own calculations as soon as that terminal is opened. Okay, but we're talking about a terminal with two gates, right? I mean, at this point, it's a modular expansion of the existing, what I assume is the executive terminal for general aviation use. That's right. And that's only an additional 18,000 square feet on top of about 2,500 square feet. That's right. And that's just a tiny change in the airport's operation. Except the maximum terminal capacity relies on only two gates and talks about six turnarounds. We're talking about an airport that currently has 115,000 operations annually, and it's going to increase maybe by 8,500 at maximum capacity of this terminal. I mean, that's less than 5%. At an airfield that is 33% operating at its maximum capacity now, how can we declare this decision arbitrary and capricious? Well, Your Honor, if you look at the table in Appendix P, you will note that just that 8,500 additional operations throws them out of conformity under the Clean Air Act. By what, three metric tons? It's eight, actually, but it doesn't matter. The amount there over, there over. I'm living in a county. Every day I drive by Pacific Science Center, and we're kicking nine million tons into the air, and we're talking about 103 tons? Here's the deal. The United States Congress said that anything over 100 tons per year of CO has to be evaluated in a conformity determination. So what does that mean, by the way? Suppose they had done what you wanted them to do, which is to take the maximum terminal for the non-terminal, the maximum terminal capacity, and then which they say would have been eight metric tons or whatever over the status level, is my understanding. And then what do you do next? What's the statute require? The statute says that if you go over conformity and you do not establish conformity in a conformity determination. That's what I'm going to know. What does that mean? Is it another study, or does it mean you can't do it? You can't get any federal money. They just gave up federal money anyway for this terminal. I mean, you can't get federal money for what? For anything having to do with the project. But right now they're saying they're not taking the federal money. Maybe that's why they're saying it. But if this court were to dismiss this case, which we've discussed, then they could get federal money tomorrow. In the sense that your biggest problem seems to depend on federal money and there may not be any federal money? Well, they've already agreed to give federal money for that terminal. They've already agreed to fund it. But it's going to decline. They declined the federal money. That's the $200,000 I was talking about earlier. But if the ROD is allowed to stand, they could agree to it tomorrow. Someday. Any time they wanted. Tomorrow morning would be fine. I mean, they don't have to wait until someday. They could say, okay. Today's not today. We know that. They're not standing there with their hand out for the $200,000 check. They're holding their hands up saying, no, thank you. If this case were cleared, this is the example of redressability. If this case is cleared and dismissed. Redressing. I'm back to the standing problem. What's the problem here that you need the court to step in and address? There's nothing happening. They haven't fully disclosed the impact of this project, specifically the air quality impacts, Your Honor. There may be no project. So, I mean, aren't you better off? To be specific, aren't you better off if we don't do something now? Because what they actually do do could be different and worse and need a whole new analysis. And I don't see how it benefits you to have us spinning our wheels on a when we don't know if this would be federal money and we don't know what the terminal's going to look like. We don't know how many flights there are going to be. We don't know what it is that they're doing. And it seems to me you're going to want to take the position with whatever they do that it all has to be done over again anyway. Well, Your Honor, Mr. McFadden has offered a solution to which I have not objected, which you may know, and when you speak with Mr. McFadden, he will explain it further. But if that's the court's view, and as long as we don't lose our position under the statute of limitations we would be willing, potentially, to go along with the court's solution. I just want to make sure we don't lose our position. Perhaps you would like to speak to Mr. McFadden about the details. Thank you, counsel. Our questions took you almost two minutes over time. Oh, I'm so sorry. Your time has expired. Thank you very much. Mr. McFadden. Good morning, Your Honors, and may it please the Court, I am Lane McFadden. I represent the Federal Respondents, the United States Department of Transportation, and the Federal Aviation Administration. This Court has now twice ordered us to consider whether there isn't some threshold justiciability problem, and I gather from this Court's questions this morning that that looms large in your minds. And the skepticism about whether these projects will ever proceed in the way they were reviewed in the EAs appears to us warranted. But at the same time, there are these inklings of continued interest from the relevant third-party actors. Allegiant Airlines, Judge Talmadge suggested, has expressly denied any interest. In fact, they told us at our we questioned them about it in response to this Court's mootness order, and they said their intent is the same as it was two years ago, which we take to mean that they intend to someday go through. I thought that was a slightly coy answer. A lot of the answers we received were coy. None of them had any details to them. We've learned a couple from that. Not a lot of them are in the record either. Well, we did submit them to this Court, Your Honor, hoping to pin someone down to something. Let me just back up for a minute. Is this a typical way for these kinds of issues to proceed? That is, with you making a decision, with you being the FAA, not you, on something that's not really at fruition anyway at that point? I mean, I gather at the point that the decision was made, it wasn't clear anything was going to happen. It was just a bunch of permissions, right? It appeared to us clear enough that it was worth embarking on the NEPA process. FAA's policy, of course, is that they won't conduct a review of some project that doesn't have some real likelihood of occurring. The understanding at the time was there wasn't a funding issue because the way that these types of proposals are generally funded is through federal grant money, and that's why you see that discussion in the record of decision of their county's eligibility for those funds. That's what we thought was going to happen. Then the county changed its mind about that, and that's what introduced all this uncertainty. This is a very unusual situation for the FAA in this kind of case. So this is not a typical problem? No, not at all. And that is why we've wrestled with how to address it in the context of the jurisdiction. There's a jurisdiction problem on the one hand. There's a limitations period in the statute on the other. I mean, she really does have a problem. If we tell her she has an upstanding, she may never get to challenge it. Yeah, that is a concern, Your Honor. I mean, 60 days is not a long time. The government's position that once the record of decision is made, and I ticked off the four key decision points that the agency approved, the amendment of the various certificates and then the construction of the terminal, is the government's position that that record of decision stands for all time? Or if nothing happens in 10 years, would there have to be a do-over of the environmental assessment? Whether there has to be a do-over is something retained to the agency's discretion, but we would in 10 years say yes. General Department of Transport would say yes. In 10 years or yes, we have to do it all over again? Yes, we have to do it all over again. There's general Department of Transportation guidance, which I can provide this Court, which governs NEPA documents, and its general rule currently is that a NEPA document is valid for about three years. Up to three years or close at this point? Eighteen months, I think. It was December 2012. But more than that, this document was based on a very specific set of plans. It is based on forecasts from the representations that were made by the airlines about what their plans were, and that's the central issue in this case, substantively, which is what is reasonably foreseeable. Well, isn't that just necessarily no longer valid? I mean, they're telling us they may still be interested, but there's no indication they're interested in the same thing they were interested in. And the county is no longer taking the money. Isn't this just simply – isn't it inevitable that you're going to have to do it over again? Unfortunately, we don't think that it is inevitable. Close to inevitable? To provide what little bit more factual context I have, on Monday morning there was a letter sent to the county, which is the airport sponsor, from a New York-based investment firm indicating they'd be in negotiations and they wanted to continue with those negotiations over the next 30 days to privately finance the same modular terminal facility that's approved in the ROD. And so that would be – if that deal was struck, and it has not been, then that would provide for the building and construction of that same facility that's already gotten environmental approval from FAA. You'd have to go back to the airlines, either both of them or some other airlines, and get some projections about how many flights they're talking about, and then you'd have to see whether they're close enough to what you've already looked at to be a good match when foreseeability is the whole issue here, how many flights are there going to be, right? That's the central question. I agree, and it has called into question the foreseeability of this whole project. That's why I do think – Well, as I understand the record, the negotiations broke down over the county's insistence that the two carriers pay for the construction of the terminal or there was discussion about who was going to pay, and the concern was we don't want to have one carrier who owns the terminal because then that carrier can exclude anybody else from using a building that it owns. And apparently the county wasn't willing to fund the $3 million cost of building the terminal itself, although you indicate apparently there's some federal money that might be available from the FAA to pay for the construction of the terminal. Not federal money, Your Honor, but private money, that there be a financing agreement from an investment company that – it's an airport investment company that does this professionally. This is their line of work. So is this the group that you're talking about that sent the letter on Monday? Yes. Okay. So this would be kind of an independent third-party owner building a terminal for anybody who wants to pay them to make use of it. So then to go back to Judge Berzon's question, wouldn't the next step be to ask the airlines, would you be willing to operate passenger aircraft out of a facility owned by this third-party entity? Wouldn't they want to know what it would cost them to use that privately owned terminal? Yes. I mean, this is all speculation on speculation. The investment company isn't going to build this until – No, no, no. We're a post-solutionist. To do something similar, I provided the court with petitioner's permission with an order from the D.C. Circuit in a case we had several years ago where something similar happened. It was an airport – This is Stratford versus the FAA. Yes, Your Honor. There was an expansion proposed at the airport there in Connecticut. The FAA conducted a review and approved it, but it was contingent on acquiring and developing some land that was owned by the Army at the time, and the Army had not at the time of the FAA's decision figured out what it was going to do with that property, so it wasn't clear if that was ever going to happen. No one briefed standing, but the D.C. Circuit asked us about it at oral argument, and after oral argument stayed the case, asked us to file status reports, and then said you can notify us when there's some final decision that indicates this injury is imminent, and at that time you can file short briefs on jurisdiction and we'll resume consideration of the case, and that's precisely what happened. Ultimately, the Army did make a decision. It took about a year, and then the D.C. Circuit did issue a final opinion in that matter and a judgment. We think that's a resolution here that avoids the concerns petitioners have expressed about losing the opportunity to comply with their 60-day statute of limitations. The challenge of FAA decision that was now issued in December of 2012, in which while as a practical matter seems to no one to be realistic, as a legal matter remains extended, remains a valid approval if the airlines decide to change their mind and go forward. What's your proposal? How long a period would you suggest that we stay and abate this case? Well, I think at the outside, I think a year and a half would be the longest. At that point, the agency would have to reconsider whether further environmental review is necessary, and, of course, if it is necessary, then that will be conducted and that's a new final agency action. So it would be helpful for you to supply the authority for that, the fact that the determination is going to lapse? Yes, Your Honor, I'd be happy to do that. And I apologize for not sending in a 28-J about the town of Stratford, but I'll certainly do that as well to get it on the record. As I hope the parties understand, we have an independent obligation under the Constitution to make sure that we actually have a case or controversy pending before us, and the state of the record was such that we had a serious question as to whether the case or controversy requirement under the Constitution is met. I agree, Your Honor. I mean, there is clearly an imminence question here, but we can't say with confidence that it is impossible that it will happen. Will an opposing counsel agree as to that particular point? Yes. On the Lujan issue. We do. And I would say we should get to the merits and decide whether this ROD was arbitrary and capricious. Thank you, Your Honor. I'd be happy to discuss the merits, in fact. You know, in doing that, it seems to me that all of these events give some more credence to the petitioner's position than might otherwise be the case, because, I mean, if we are given the fact that this is all so amorphous and unclear about what's going to actually happen, the real question is whether if everybody's plans are different than the ones that you were projecting on, why doesn't it make most sense for you to have looked at the maximum possible usage of the turmoil instead of what people were telling you, which all turns out to be wrong anyway? Well, the answer to that question, Your Honor, is that to the extent there's evidence that what we had reviewed in the final EA isn't going to happen, that evidence all points to fewer operations than what had been contemplated, not more. No other airline has come out and said we're going to fill that terminal to capacity as evaluated in Appendix P. Well, I don't have a clue. I mean, maybe apparently Alaska Airlines has some interest. Alaska Airlines is a big airline. I mean, maybe they're going to show up and decide to have ten flights a day. Now, I gather that they would have to be separately approved. That's correct. They would and reviewed. Is that discretionary? I mean, I also gather that as long as they're a good airline and there's a place for them, you don't have much choice but to approve them. Is that right? Well, there's the question of approving their operation specifications amendment, which is a safety issue, and then there's also the issue of whether that proposal will be reviewed under NEPA, which it would. NEPA would apply to that approval and the agency would Doesn't that become an incremental problem, i.e., every time you have something, the next thing is only a little bit? So it's not the same approval because it's not being done cumulatively. Well, of course, cumulative impacts under NEPA are limited by regulation to the reasonably foreseeable future actions. No, I'm saying backwards. If you were to go ahead with what you have now and Horizon and Legion were actually there and then Alaska shows up and says we want to do some flights too, the only thing you would be looking at at that point is the impact of the Alaska increment. Isn't that right? Well, that's right. I mean, Your Honor is asking whether the environmental baseline would change, which of course it does in all future decisions. In all applications of NEPA, there is always some future project which relies on the past project and the past project has to be explained. Let me put it in a slightly different way. Suppose a third airline comes in or suppose Horizon decides to bring more flights than those that were specifically addressed in the EA or the FONSI. Would that trigger the necessity then for a new ROD and an EA? I'm sorry, Your Honor. If a new airline comes in and has exactly the same proposal? Well, this was done on the basis of two airlines. Right. Now suppose a third airline, United, Delta, whoever decides they want to join the fray here. Does that trigger a new requirement for an environmental assessment or a NEPA action? It does trigger the requirement for a new NEPA action. Any new airline, even if their proposal is identical. And so as a result, the NEPA analysis may turn out to be the same, but it also may not. I mean, here we are speculating, but you would nevertheless have a public disclosure of those impacts prior to the agency's approval. So if we were to, just as hypothetically, if we were to determine that this particular FONSI did not show arbitrariness or capriciousness and therefore in effect deny the PFR, if it turns out that future operations are much greater than those projected here, that would trigger the need for a new environmental impact statement or an environmental assessment or perhaps resulting in a FONSI or some other conclusion. That's right. Changes by these airlines in their city pairs or routes would trigger that requirement. If a new airline wanted to do it, that would trigger the requirement. What is the consequence of switching the baseline? I mean, isn't the consequence at that point that there is, as I was saying before, you're looking then at the increment and not at the total? No, Your Honor, because the cumulative impacts analysis, which is required, is retrospective. And so when you're looking at the incremental increase, you're looking at what that does when it's combined with all of the past actions and all the past approvals. So if there is some tipping point at which there are just too many operations at Payne Field for some environmental reason, that is accounted for in the cumulative impacts analysis of past actions that have been approved. And so the future NEPA review is not constrained to only that little increase. I mean, there are various threshold NEPA steps, as I understand it, i.e., do we have to do an EA at all? Do we have to do anything is step one and step two. The semi-EIS, the EA process. In those determinations, I mean, I can't believe that if Horizon Airlines came back and said, now we're going to use a new plane, that you would actually get to the point of as much investigation as you did here. That may be so. This is just not going to have any impact. We're not doing anything. That's not right. That would require another amendment to their Part 119 certificate. Let's say that even though they don't own any, Horizon decided they wanted to fly 747s in and out of Payne Field, even though they're manufactured at the end of the field. That would require a reopening, would it not? Because this is a different type of aircraft than the MD-83s that they were proposing to use. You're both right. The change to the operation specifications, different plane, different routes, would trigger the requirement of FAA reviewing it for NEPA purposes. But as Judge Berzon points out, step one of that purpose is to look to see whether any categorical exclusion applies. And it's possible, although I'm not sure, that there might be one to apply. So the agency may say our NEPA analysis is that no further review is required. Now, that has limitations, extraordinary circumstances, such as increase in emissions or noise would mean you would not be allowed to use that categorical exclusion. You'd move to an environmental assessment. And if you're changing your flight to use much bigger, much more heavily polluted planes, perhaps that would be the result. And you would, in fact, get, as your Honor said, the level of analysis you got here. But I take it your position is that under the existing environmental assessment, even though we now know Allegiant and Horizon are not coming in imminently, that the development of the terminal could still proceed, even though it's a different entity funding the terminal than perhaps everyone thought at the time that the record of decision was released. That's right. The agency's environmental review of the terminal, and remember no construction impacts are being challenged here, there's no allegation that there's environmental harm from the building of the terminal, was contingent on a specific plan. And if the private funding builds that specific plan, there's no role for FAA to play in further review or approval of that capacity. It would have to be the same 18,000-foot modular expansion on top of the existing... It would have to be the same design in the same place. If there's no federal money in the terminal, why do they have to do anything? Why is the federal government involved at all in terms of environmental review? Well, the construction of the... They're involved in the usage issues. But suppose they just decided to build a building somewhere in the airport. Does that have to be reviewed by the federal government? You know, I admit I don't fully know the answer to that question. In this case, it was reviewed because it was a reasonably foreseeable consequence of the... In theory, it was going to be federally funded. Well, and that plus the fact that the proposal to amend the certificate and allow these flights required a facility that didn't exist yet. So someone was going to have to build something, and the FAA could not ignore that in its review. Counsel, before your time expires, come back to the point of conflict between you and the petitioner. It has to do with air quality. You heard what Ms. Litchman had to say. What's the government's response? With respect to air quality, for one thing, the air quality analysis is complete in the FAA, the final EA, and is not being challenged. The only challenge is we think that the maximum terminal capacity scenario is the more likely one. Our conflict is that we think that it's completely unlikely. It explains on its face, you can see it, SCR 104, why the reasons are that that was highly speculative. It was only given because so many commenters had come to us and said, we're concerned that once you have changed the certificate, there will be an unlimited amount of commercial air traffic at this airport. It's never had it before. And while that's not true for legal reasons, we thought that in the interest of full public disclosure, we would provide this worst-case scenario for them to look at. The ultimate injury they're alleging is that if they were right, that the appendix P forecast was reasonably foreseeable, that that is a reasonably foreseeable outcome or an indirect effect, these would be indirect emissions, it would be over the 100 tons a year of carbon monoxide by some thin margin. That would trigger the requirement under the Clean Air Act to perform a conformity analysis, which is just what it sounds like. It may not necessarily require any mitigation or further action on the agency's part, but a formal determination consistent with EPA regulations would have to be conducted and published, and EPA might require some mitigation, it might not. There's going to be a stay, and nothing's going to happen. Maybe it may just go ahead and do it, and then we won't have an issue. And if we were led to believe during the stay that more flights than anyone has ever proposed were going to happen, then yes, we would consider that. And we do, as Your Honors pointed out, have an expression of interest from Alaska that has also gone nowhere, and which was filed after this decision was issued by FAA, but maybe they'll change their mind in this limitation. Sounds like Alfonso Gaston to me. If Your Honors are at all interested in the idea of staying pending some resolution of the jurisdictional issue, we propose that you place the case in the mediation office of the circuit to allow the parties to have discussions with the mediator about what events we think would happen, would have to happen to trigger this court's jurisdiction to have us resubmit it to you for judgment. That's a pretty good idea. Thank you very much, counsel. The case just argued will be submitted for decision, and the court will adjourn.
judges: O'SCANNLAIN, BERZON, TALLMAN